*16*

FILED

JAN -5 2012

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

<u>FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re | Case No. 10-19825-B-12 |
| | DC No. WW-12 |
| Francisco L. Parreira and Maria I. Parreira, | |
| Debtors. | |

## AMENDED MEMORANDUM DECISION REGARDING OBJECTION TO LEGAL FEES AND PROOF OF CLAIM

Riley C. Walter, Esq., of Walter & Wilhelm Law Group, appeared on behalf of the debtors, Francisco L. Parreira and Maria I. Parreira.

Craig B. Fry, Esq., of Lang, Richert & Patch, appeared on behalf of Fresno-Madera Production Credit Association.

In this contested matter, the parties have asked the court to determine the amount of legal fees that can be recovered pursuant to 11 U.S.C. § 506(b)[1] by Fresno-Madera Production Credit Association ("PCA") for work performed in connection with this bankruptcy case. PCA is a fully secured creditor and is entitled by contract to recover reasonable attorney's fees as part of its claim.

---

[1] Unless otherwise indicated, all bankruptcy, chapter, code section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036, as enacted and promulgated after October 17, 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.

*202*

1    PCA has filed an amended proof of claim requesting attorney's fees incurred
2    through February 10, 2011, in the amount of $53,384.50.[2]  The court deems the
3    Debtors' objection to those fees to also be an objection to PCA's amended claim.
4    Based upon a prior stipulation of the parties, only $23,300 of PCA's attorney's
5    fees, those for legal services performed after September 30, 2010, are now in
6    dispute.  For the reasons stated below, the Debtors' objection will be overruled.
7    PCA's legal fees will be allowed in full.

8         This memorandum contains the court's findings of fact and conclusions of
9    law required by Federal Rule of Civil Procedure 52(a), made applicable to this
10   contested matter by Federal Rule of Bankruptcy Procedure 7052.  The bankruptcy
11   court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 11 U.S.C.
12   § 1225 and General Orders 182 and 330 of the U.S. District Court for the Eastern
13   District of California.  This is a core proceeding as defined in 28 U.S.C.
14   §§ 157(b)(2)(A) & (B).

15   **Background and Findings of Fact.**

16        This bankruptcy was filed under chapter 12 on August 26, 2010.  The
17   debtors, Francisco and Maria Parreira are dairymen (the "Debtors").  PCA is their
18   largest secured creditor.  On the petition date, PCA was owed approximately
19   $550,833.[3]  The debt to PCA was secured by a first priority lien against the
20   Debtors' personal property, including the dairy herd and the milk checks.  Based
21   on the Debtors' schedules, the dairy herd had a value of $778,800 and the milk
22   checks, including the retains, had a value of $78,627.  There is no dispute that the
23   debt to PCA was fully secured by a substantial margin.

24        After extensive negotiations, in early October 2010, the Debtors and PCA
25

26        [2]PCA's billing records are attached to its amended proof of claim filed on
     February 10, 2011.  PCA did not request reimbursement of any hard costs.
27
28        [3]This amount includes principal and interest as reflected in PCA's first proof of
     claim filed on December 17, 2010.  It does not include attorney's fees and does not
     reflect adjustments and credits agreed to by the parties in the plan confirmation process.

1  entered into a written agreement entitled "Stipulation For Order Re Agreed

2  Financing, Heifer Swap, Use of Collateral, Valuation of Collateral and Plan

3  Treatment" (the "October Stipulation" - filed on October 19, 2010). It provided,

4  *inter alia*, a comprehensive facility for the treatment of PCA's secured claim in a

5  chapter 12 plan. The Debtors confirmed a consensual chapter 12 plan by order

6  dated February 25, 2011 (the "Plan"). A copy of the October Stipulation was

7  attached to and incorporated into the Plan to memorialize the treatment of PCA's

8  claim.

9        At the time the Plan was confirmed, the parties could not agree on the

10  amount of attorney's fees that PCA could recover as part of its claim. However,

11  the parties did agree in the October Stipulation that the attorney's fees incurred

12  by PCA through September 30, 2010, were reasonable in the amount of

13  $30,084.50. (October Stipulation, ¶5(B).) According to PCA's billing records,

14  PCA's actual legal expenses through September 30, 2010, were $30,084.50, the

15  exact amount agreed to in the October Stipulation.

16        The billing records for PCA's legal fees are attached to PCA's amended

17  proof of claim (the "Billing Records"). Overall, PCA incurred legal fees in

18  connection with this bankruptcy case, from August 17, 2010, through February

19  10, 2011, in the amount of $53,384.50, representing 179 hours of attorney and

20  paralegal time. The amount of those fees for legal work performed after

21  September 30, 2010, the fees in dispute here, is $23,300, representing 78.1 hours

22  of attorney and paralegal time (the "Disputed Fees"). Of that time, 15.1 hours at

23  a cost of $4,300, was devoted just to this fee dispute (see discussion below).

24  **Issue Presented.**

25        The Debtors initially objected to the total amount of PCA's fees on the

26  grounds that the fees are excessive and unreasonable. While the Debtors do not

27  deny PCA's right to procure any level of legal service it deems to be appropriate,

28  they do dispute PCA's right to recover those fees from the Debtors to the extent

3

1  that the level of legal service was unnecessary and unreasonable.  However, at
2  oral argument, Debtors' counsel acknowledged that the Debtors are bound by the
3  October Stipulation and are now precluded from objecting to PCA's legal fees
4  incurred through September 30, 2010.  The issue therefore is how much of PCA's
5  post-September 30th legal fees, the Disputed Fees, should be awarded for
6  inclusion in PCA's claim.
7  **Analysis and Conclusions of Law.**
8      **The Reasonable and Necessary Standard.**  The Debtors contend that
9  PCA's attorneys failed to exercise prudent billing judgment and essentially "over-
10 lawyered" this case under the circumstances.  Those circumstances include the
11 facts that (1) PCA was significantly oversecured at all times by the dairy herd and
12 the milk checks, and (2) the case was relatively straightforward and
13 uncontroversial.[4]  With regard to the first issue, there appears in retrospect to be
14 no dispute that PCA was at all times well collateralized, even though the value of
15 that collateral was always susceptible to decline.  Resolution of the second issue
16 is more difficult because the Debtors objected to PCA's entire claim for legal
17 fees, not just the Disputed Fees, and because the Debtors offer few specifics for
18 the court to rule on.  Neither party presented a comprehensive "task" analysis to
19 show how the Disputed Fees should be allocated to different categories of work.
20      When bankruptcy courts are asked to review the legal fees incurred by a
21 professional person employed to work in a case under § 327, the process begins
22 with reference to the Bankruptcy Code which offers a statutory framework for
23 analyzing the fees.  The Code mandates that professional fees must be actual,

---

27      [4]The Debtors also argue that PCA acted inequitably with regard to the handling
28 of their loan, interrupted the flow of milk checks, and unnecessarily forced the Debtors
   to seek bankruptcy protection in the first place.  That argument is not properly raised in
   the context of this post-confirmation dispute and has not been considered by the court.

4

1  necessary and reasonable.[5]  Here, PCA does not seek to recover its fees under

2  § 330 because its attorneys did not work for the bankruptcy estate.  As the holder

3  of a fully secured claim, PCA seeks to recover its attorney's fees under the

4  authority of § 506(b).[6]  Section 506(b) also incorporates the "reasonableness"

5

6  [5]Professional compensation for persons employed to work for the bankruptcy
estate is governed by § 330(a) which provides in pertinent part:

7

8  (a)(1) After notice to the parties in interest and the United States Trustee and a
hearing, . . . the court may award . . . a professional person employed under
section 327 or 1103–

9

10  (A) reasonable compensation for actual, necessary services rendered by
the . . . professional person, or attorney . . . ; and

11  (B) reimbursement for actual, necessary expenses.

12  (2) The court may, on its own motion or on the motion of . . . any other party in
interest, award compensation that is less than the amount of compensation that is

13  requested.

14  (3) In determining the amount of reasonable compensation to be awarded to . . .
[a] professional person, the court shall consider the nature, the extent, and the

15  value of such services, taking into account all relevant factors, including–

16  (A) the time spent on such services;

17  (B) the rates charged for such services;

18  (C) whether the services were necessary to the administration of, or
beneficial at the time at which the service was rendered toward the

19  completion of, a case under this title;

20  (D) whether the services were performed within a reasonable amount of
time commensurate with the complexity, importance, and nature of the

21  problem, issue, or task addressed;

22  (E) with respect to a professional person, whether the person is board
certified or otherwise has demonstrated skill and experience in the

23  bankruptcy field; and

24  (F) whether the compensation is reasonable based on the customary
compensation charged by comparably skilled practitioners in cases other

25  than cases under this title.

26  [6]11 U.S.C. § 506(b) provides:

27  To the extent that an allowed secured claim is secured by property the value of
which, after any recovery under subsection (c) of this section, is greater than the amount

28  of such claim, there shall be allowed to the holder of such claim, interest on such claim,
and any reasonable fees, costs, or charges provided for under the agreement or State

5

1  test.  In determining reasonableness under § 506(b), the bankruptcy court does

2  not look to state law, but rather makes an independent evaluation under federal

3  law.  *See In re 268 Ltd.*, 789 F.2d 674, 676–77 (9th Cir. 1986).  Because all

4  professional fees awarded in a bankruptcy case are effectively paid from assets of

5  the bankruptcy estate and because both Code sections use the term "reasonable,"

6  the court may apply to its § 506(b) analysis the same principles and case law that

7  govern the award of fees under § 330.  *See In re Segovia* (unpublished), 2008 WL

8  8462967 (9th Cir. BAP 2008).

9        The concept of reasonableness when applied to a body of legal work

10  invokes a combination of objective and subjective inquiries.  Objectively, the

11  court must be persuaded that the legal work performed in a particular case was

12  consistent with the kind of legal service which a similarly situated creditor might

13  require.  The court must also determine that the value of the legal services is

14  consistent with the cost of similar legal services for similar work.  Subjectively,

15  the court must inquire whether the professionals exercised prudent billing

16  judgment in the decisions that were made to engage the legal services, the way

17  the work was assigned, and the manner in which it was actually performed.  The

18  Ninth Circuit B.A.P. discussed the "reasonableness" factor in this context,

19  stating:

20        Reasonableness embodies a range of human conduct.  The key
        determinant is whether the creditor incurred expenses and fees that
21        fall within the scope of the fees provision in the agreement, and
        took the kinds of actions that similarly situated creditors might
22        reasonably conclude should be taken, or whether such actions and
        fees were so clearly outside the range as to be deemed
23        unreasonable.  The bankruptcy court should inquire whether,
        considering all relevant factors including duplication, the creditor
24        reasonably believed that the services employed were necessary to
        protect his interests in the debtor's property.
25

26  *In re Dalessio*, 74 B.R. 721, 723 (9th Cir. BAP 1987) (citing *In re Carey*, 8 B.R.

27

28  ─────────────────
   statute under which such claim arose.

1   1000, 1004 (Bankr. S.D. Cal. 1981)).

2          Under § 506(b), the court has broad discretion in determining the amount

3   of attorney's fees and in reviewing the fees for potential abuse of right. *Dalessio*,

4   74 B.R. at 724 (citing *In re Fitzsimmons*, 51 B.R. 600 (9th Cir. BAP 1985). An

5   oversecured creditor has the burden of proving the reasonableness of its fee claim

6   under § 506(b). *In re Atwood*, 293 B.R. 227, 233 (9th Cir. BAP 2003). If

7   applying for attorney's fees under § 506(b), the "attorney . . . bears the burden of

8   proving the reasonableness of those fees, which can only be done by presentation

9   of carefully detailed applications and supporting documentation." *Dalessio*, 74

10  B.R. at 724 (citing *In re Meade Land & Dev. Co.*, 577 F.2d 858, 860 (3d Cir.

11  1978)).

12         The purpose of the reasonableness limitation of § 506(b) . . . is to prevent
           overreaching or collusive use of fee arrangements. A court should not
13         reward a creditor whose overly aggressive attorney harasses and opposes
           the debtor at every stage of the bankruptcy proceeding, nor should an
14         oversecured creditor be given a blank check to incur fees and costs which
           will automatically be reimbursed out of its collateral.
15

16  *Id.* at 723 (citation omitted).

17         **Valuing the Legal Services, the Lodestar Approach.** In the Ninth

18  Circuit, the customary method for determining the reasonableness of attorney's

19  fees is the "lodestar" calculation. *Morales v. City of San Rafael*, 96 F.3d 359,

20  363 (9th Cir. 1996), *amended*, 108 F.3d 981 (9th Cir. 1997). Several courts have

21  also applied the lodestar method in determining the reasonableness of fees

22  requested under § 506(b). *See, e.g., In re Coy Farms, Inc.*, 417 B.R. 17, 22

23  (Bankr. N.D. Ohio 2009); *In re Nixon*, 400 B.R. 27, 38 (Bankr. E.D. Pa. 2008); *In*

24  *re 900 Corp.*, 327 B.R. 585, 593–94 (Bankr. N.D. Tex. 2005). *But see*

25  *Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc.*, 924 F.2d 955, 961

26  (9th Cir. 1991) (concluding that bankruptcy court's use of an alternative formula

27  rather than the lodestar method for § 506(b) purposes was not abuse of

28  discretion).

7

1    "The 'lodestar' is calculated by multiplying the number of hours the

2    prevailing party reasonably expended on the litigation by a reasonable hourly

3    rate." *Morales*, 96 F.3d at 363 (citation omitted).  "This calculation provides an

4    objective basis on which to make an initial estimate of the value of a lawyer's

5    services." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  A compensation

6    award based on the loadstar is a presumptively reasonable fee. *In re Manoa Fin.*

7    *Co.*, 853 F.2d 687, 691 (9th Cir. 1988).

8           In rare or exceptional instances, if the court determines that the lodestar

9    figure is unreasonably low or high, it may adjust the figure upward or downward

10   based on factors enumerated in *Kerr v. Screen Guild Extras, Inc.*, 526 F.2d 67

11   (9th Cir. 1975).  *Morales*, 96 F.3d at 363–64.  The original *Kerr* factors include:

12                  (1) the time and labor required,

13                  (2) the novelty and difficulty of the questions involved,

14                  (3) the skill requisite to perform the legal service properly,

15                  (4) the preclusion of other employment by the attorney due to
                    acceptance of the case,
16
                    (5) the customary fee,
17
                    (6) whether the fee is fixed or contingent,
18
                    (7) time limitations imposed by the client or the circumstances,
19
                    (8) the amount involved and the results obtained,
20
                    (9) the experience, reputation, and ability of the attorneys,
21
                    (10) the "undesirability" of the case,
22
                    (11) the nature and length of the professional relationship with the
23                  client, and

24                  (12) awards in similar cases.

25   *Kerr*, 526 F.2d at 70 (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714

26   (5th Cir. 1974)).

27          However, some of the *Kerr* factors have been subsumed as a matter of law

28   within the initial lodestar calculation and should be taken into account in either

the reasonable hours component or reasonable hourly rate component. *Morales*, 96 F.3d at 363–64 & nn.8–9. These include (1) the novelty and complexity of the issues, *Jordan v. Multnomah County*, 815 F.2d 1258, 1262 n.6 (9th Cir. 1987) (citing *Blum v. Stenson*, 465 U.S. 886, 898–900 (1984)); (2) the special skill and experience of counsel, *id.*; (3) the quality of representation, *id.*; (4) the results obtained, *id.*; and (5) the contingent nature of the fee agreement, *City of Burlington v. Dague*, 505 U.S. 557, 565–67 (1992). These subsumed factors may not act as independent bases for adjustments to the lodestar figure. *Miller v. Los Angeles County Bd. of Educ.*, 827 F.2d 617, 620 n.4 (9th Cir. 1987).

Given the two-step "lodestar" approach, the court has considerable discretion in determining the reasonableness of attorney's fees. *Gates v. Duekmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992). It is appropriate for the court to have this discretion "in view of the [court's] superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley*, 461 U.S. at 437.

However, even with this discretion, "[i]t remains important . . . for the [court] to provide a concise but clear explanation of its reason for the fee award." *Id.* Further, the court must "articulate with sufficient clarity the manner in which it makes its determination." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1211 (9th Cir. 1986) (citation omitted), *amended*, 808 F.2d 1373 (9th Cir. 1987). This does not require the court to include detailed calculations, but "something more than a bald, unsupported amount is necessary. While the [court] need not set forth in exhaustive detail the method of calculating an attorney's fee award, at the very least [it] must set forth the number of hours compensated and the hourly rate applied." *Id.* at 1211 n.3. When the fees awarded differ substantially from the fees requested, however, then an explanation as to how the court arrived at its figure is necessary. *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1447 (9th Cir. 1984), *modified*, 742 F.2d 520 (9th Cir. 1984).

**Application of the Lodestar to This Case.** The first step in the "lodestar" process, the "reasonable hours" analysis, requires the court to determine if the attorneys exercised prudent billing judgment in the performance of their duties to the client. Prudent billing judgment is an essential part of the lodestar analysis. Unless the court is satisfied that the attorneys were prudent and made a good faith effort to perform their work efficiently, then the court cannot apply the lodestar presumption to any of their fees. On the "billing judgment" issue, the Supreme Court has commented,

> The [court] . . . should exclude from this initial fee calculation hours that were not "reasonably expended." Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the [party requesting attorney's fees] should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. In the private sector, "billing judgment" is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.

*Hensley*, 461 U.S. at 434 (citations and internal quotation marks omitted, emphasis in original).

It is not sufficient for the fee applicant to simply represent that all of the time claimed was usefully spent, and the court should not uncritically accept these representations. *Jordan*, 815 F.2d at 1263 n.8 (citation omitted). Instead, the fee applicant must show that the time spent was reasonably necessary and that counsel made a good faith effort to exclude excessive, redundant, or unnecessary hours. *Id.* (citation omitted).

In this case, the court began its "reasonable hours" analysis of the Disputed Fees by first reviewing the docket to assess the length and relative complexity of the case. The court then looked to the Billing Records to determine (1) what services PCA's attorneys actually performed and (2) whether they provided those services in a "prudent" manner. From the docket, this does not appear to have been a difficult case. At the same time, the docket does not

10

suggest that PCA engaged in any frivolous or unnecessary legal antics. The bankruptcy was filed on August 26, 2010. The hearing at which the court approved the Debtors' Plan, with some modifications, was held 119 days later on December 22, 2010. By that time, the Debtors and PCA had essentially resolved their differences as reflected in the October Stipulation. On December 8, 2010, PCA filed a three-page "conditional" non-opposition to confirmation of the Plan. Even though the Plan included the October Stipulation, PCA's conditional non-opposition sought to address several provisions that PCA felt were unclear or ambiguous in the Plan. The complete docket in this case, from the filing of the petition to the date of the hearing on this objection includes 181 entries. The number of docket entries after September 30, 2010, is 103. Other than the conditional non-opposition referred to above, nothing from PCA appears on the docket after September 30, 2010, until the pleadings it filed in response to this objection. There were no motions for relief from the automatic stay or contested matters that required an evidentiary hearing.

A review of the Billing Records reveals the "rest of the story," the activities that are not readily apparent from the docket. Billing entries after September 30, 2010, reflect a significant amount of activity related to, *inter alia*, completion of the October Stipulation, negotiation and editing of the Plan, editing of the proposed confirmation order, preparation of PCA's proof of claim, and this fee objection. The Debtors argue that some of this effort was extraordinary, but both sides point to the other as the cause of any "unnecessary" work. The trial court, with only the Billing Records and its personal understanding of the case, cannot assign "fault" for allegedly excessive fees incurred in the Plan confirmation process without, at a minimum, an evidentiary hearing. The cost of further litigation over the Disputed Fees would certainly be counter productive and would not justify any possible benefit which might flow therefrom.

The Billing Records do not suggest that PCA's attorneys engaged in any

11

1    legal activities after September 30, 2010, that were not reasonably focused on the

2    achievement of a common goal, confirmation of a successful reorganization Plan

3    for the Debtors' dairy operation.  As this court has observed of other creditors in

4    similar cases, PCA did not force unnecessary objections to the use of cash

5    collateral, it did not seek to shut down the dairy operation through prosecution of

6    a stay relief motion, and it did not seek to leverage its bargaining position by

7    interjecting inappropriate threats to the Debtors' discharge.

8          Finally, the Billing Records do not suggest that PCA's attorneys ignored

9    their duty to act prudently.  All of the time was billed in 1/10 hour increments.

10   Virtually all of the Disputed Fees were generated by two attorneys, René

11   Lastreto, II, Esq., and Craig B. Fry, Esq.  While Mr. Lastreto assumed an

12   oversight and review roll, most of the work was delegated to Mr. Fry, who

13   carried the "laboring oar" at a significantly lower billing rate ($300 per hour).

14   The attorneys' billing strategy after September 30, 2010, does not appear to be

15   any different from the billing strategy employed before that date and the Debtors

16   have already stipulated that those fees were reasonable.  There was virtually no

17   duplication of effort.  The few inter-office conferences were relatively short in

18   duration.  Many of the entries for inter-office conferences were billed at "no-

19   charge."  Many of the "conferences" were billed by only one attorney with no

20   corresponding billing entry from the other participants.

21         The Debtors object to the fact that PCA's attorneys spent 15.1 hours, at a

22   cost of $4,300 (by the Debtors' calculation), devoted to this fee dispute.  The

23   Debtors do not detail which specific billing entries warrant scrutiny, so the court

24   cannot respond to this objection except in general terms.  The Debtors instigated

25   this fee dispute after PCA declined to reduce its fees to an amount offered by the

26   Debtors.  It would be completely arbitrary for this court to simply decree how

27   much the defense of a fee dispute should cost.  As stated above, PCA's attorneys

28   did exercise prudent billing judgment in their handling of the case.  As a general

12

rule, the professional time spent in the presentation of a fee application is
necessary and reasonable and eligible for compensation from the estate. *See
generally In re Nucorp Energy, Inc.*, 764 F.2d 655 (9th Cir. 1985) (fees incurred
by debtor's counsel for preparation of its fee application in compliance with §
329(a) and Fed. R. Bankr. P. 2016 is compensable under § 330).

The Debtors rely heavily on the language in the *Dalessio* decision to
support their request for reduction of PCA's legal fees. While the general
principles stated in *Dalessio* are sound, the case itself is distinguishable by its
egregious facts. The creditor in *Dalessio* was substantially oversecured and
adequately protected by an interest in real property. *Dalessio*, 74 B.R. at 723.
The creditor ultimately recovered from a sale of the property the full amount of
its principal, interest, prepetition late charges and advances to the holder of the
senior lien. *Id.* The attorney's fees at issue were fees the creditor incurred to
aggressively and unnecessarily prosecute an adversary proceeding for relief from
the automatic stay and an objection to the debtor's disclosure statement. *Id.* at
722. Based on the inherent nature of the collateral, and the level of adequate
protection for the secured claim, the court held that all of the requested attorney's
fees and costs may not be warranted under § 506(b) and remanded the matter to
the bankruptcy court for further factual findings. *Id.* at 724.

Here, PCA's collateral consisted of dairy cows and milk checks, both of
which are inherently perishable and easily subject to diminution or loss if not
monitored and protected. Milk checks must be spent on operating expenses,
some of which may not be appropriate. Dairy cows can be easily transported,
sold or rendered useless if not properly fed and cared for. Unlike the real-
property-secured mortgagee in *Dalessio*, PCA required the services of counsel to
deal with cash collateral issues and transactions involving a partial sale of the
dairy herd. Unlike *Dalessio*, PCA was not paid in full from an early liquidation
of its collateral. Instead, it had to participate actively in the Plan confirmation

13

1   process. The Plan contemplates that PCA will be paid overtime, with revenues

2   generated through ongoing operations of the dairy, and PCA must necessarily

3   share some of the risk associated with that. By the inherent nature of PCA's

4   collateral, it was not unreasonable that PCA took an active roll in this case. The

5   78.1 hours that comprise the Disputed Fees do not appear to be unreasonable and

6   unnecessary under those circumstances. The court is persuaded that PCA's

7   attorneys exercised prudent billing judgment in their handling of the case.

8          Turning now to the second "lodestar" factor, the court must determine if

9   PCA's legal services were billed at a reasonable hourly rate. The "reasonable

10  hourly rate" is determined by reference to the prevailing market rates in the

11  relevant community. *Blum*, 465 U.S. at 895. The relevant community is

12  generally the forum in which the court sits. *Barjon v. Dalton*, 132 F.3d 496, 500

13  (9th Cir. 1997) (citation omitted). However, the court may consider rates outside

14  of the forum "if local counsel was unavailable, either because they are unwilling

15  or unable to perform because they lack the degree of experience, expertise, or

16  specialization required to handle properly the case." *Id.* (citation and internal

17  quotation marks omitted). After defining the relevant community, the court

18  determines the reasonable hourly rate in that community. The standard is the

19  "rate prevailing in the community for similar work performed by attorneys of

20  comparable skill, experience, and reputation." *Id.* at 502 (citation and internal

21  quotation marks omitted).

22         The fee applicant has the burden of "produc[ing] satisfactory evidence—in

23  addition to the attorney's own affidavits—that the requested rates are in line with

24  those prevailing in the community for similar services by lawyers of reasonably

25  comparable skill, experience and reputation." *Blum*, 465 U.S. at 895 n.11.

26  Affidavits of the attorney and other attorneys regarding prevailing fees in the

27  community, as well as rate determinations in other similar cases, are satisfactory

28  evidence of the prevailing market rate. *United Steelworkers of Am. v. Phelps*

1 | *Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990).

2 |     With regard to the hourly rates billed for PCA's legal work, the court finds

3 | nothing unreasonable about this component of the lodestar. Neither party

4 | introduced any evidence of the prevailing rate for legal services in this

5 | community. At the same time, neither party has raised any objection to the

6 | hourly rates billed by the attorneys and paralegals on either side of this case. The

7 | court notes that the hourly rate of PCA's lead attorney (René Lastreto, II, Esq., at

8 | $350 per hour) was substantially less than the hourly rate of the Debtors' lead

9 | attorney (Riley C. Walter, Esq., at $395 per hour). This case is located in Central

10 | California, as are the law firms that performed all of the legal work for both the

11 | Debtors and PCA. Both law firms employ competent experienced attorneys who

12 | regularly appear in this court representing similar clients in similar kinds of cases.

13 | The hourly rates billed by the professionals on both sides of this case appear to be

14 | in line with the level of skill required in this kind of case and the customary fee

15 | for comparable legal service in this community.

16 | **Conclusion.**

17 |     Based on the foregoing, the court finds and concludes that the legal fees

18 | incurred by PCA after September 30, 2010, were necessary and reasonable under

19 | the circumstances. Accordingly, PCA's fees will be allowed in full as reflected

20 | in its amended proof of claim. The Debtors' objection will be overruled.

21 |     Dated: January _____5_____, 2012

22 |

23 |

24 | W. Richard Lee
   United States Bankruptcy Judge

25 |

26 |

27 |

28 |

Francisco & Maria Parreira, Case No. 10-19825-B-12/DC No. WW-12

Francisco L. Parreira
Maria I Parreira
23423 Road 16
Chowchilla, CA 93610

Riley C. Walter, Esq.
Attorney at Law
205 E. River Park Circle, Ste. 410
Fresno, CA 93720

M. Nelson Enmark, Esq.
Chapter 12 Trustee
3855 N. West Ave., Ste. 108
Fresno, CA 93705

Craig B. Fry, Esq.
Attorney at Law
P.O. Box 40012
Fresno, CA 93755-0012
Facsimile: 228-6727

René Lastreto, Esq.
Attorney at Law
P.O. Box 40012
Fresno, CA 93755-0012

Office of the U.S. Trustee
U.S. Courthouse
2500 Tulare St., Ste. 1401
Fresno, CA 93721